NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0630-12T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES BUCKNER,

     Defendant-Appellant.

| APPROVED FOR PUBLICATION |
| :---: |
| **May 5, 2014** |
| **APPELLATE DIVISION** |

Argued January 27, 2014 – Decided May 5, 2014

Before Judges Parrillo, Harris and Kennedy.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 10-06-0697.

Brian Plunkett, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Plunkett, of counsel and on the brief).

Jeffrey P. Mongiello, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Frank J. Ducoat, Deputy Attorney General, of counsel and on the brief; Kenneth A. Burden, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

     In New Jersey, justices of the Supreme Court and judges of

the Superior Court "hold their offices" for seven years, and upon reappointment by the Governor, "hold their offices during good behavior" until they reach the age of seventy. N.J. Const. art. VI, § 6, ¶ 3. Justices and judges "shall be retired upon reaching" their seventieth birthday. Ibid. To that end, the Legislature has enacted the "Judicial Retirement System Act," N.J.S.A. 43:6A-1 to -46, which governs judicial pensions, and, among other things, provides that justices and judges who have reached seventy years "shall be retired forthwith." N.J.S.A. 43:6A-7.

This case presents a challenge to the constitutionality of N.J.S.A. 43:6A-13(b), which authorizes the New Jersey Supreme Court to recall retired judges for temporary service, including those who have reached age seventy, an issue of first impression in this State. It is brought by defendant James Buckner, whose trial on robbery and aggravated assault charges was presided over by a seventy-three-year-old judge who had been recalled for temporary service by the Supreme Court and who had earlier denied defendant's pre-trial motions for disqualification and for recusal from the disqualification motion.

Although the New Jersey Constitution contains two provisions pertaining to the compulsory retirement of judges and justices at age seventy, N.J. Const., art. VI, § 6, ¶ 3 (the

Judicial Article) and N.J. Const. art. XI, § 4, ¶ 1 (the Schedule Article), defendant relies only on the latter in support of his argument on appeal that he is entitled to a new trial because the presiding judge was constitutionally disqualified from serving as a Superior Court judge based solely on his age.  For the sake of completeness, however, we address both constitutional provisions in finding they do not conflict with the practice legislatively prescribed in N.J.S.A. 43:6A-13(b).

I. Development of Constitutional Provision

To place the issue in proper perspective, we first trace the development of these constitutional provisions.  To date, New Jersey has had three State Constitutions.  The first, the Constitution of 1776, N.J. Const. of 1776 art. XII, which preceded the Federal Constitution and was necessarily drawn in haste,[1] and the second, the Constitution of 1844, N.J. Const. of 1844 art. VII, which was ratified after adoption of the Federal

---

[1] New Jersey was the third colony to adopt a Constitution.  John Bebout, Introduction to Proceedings of the New Jersey State Constitutional Convention of 1844, at xvi (New Jersey Writers' Project ed., 1942), available at http://lawlibrary. rutgers.edu/cgi-bin/diglib.cgi?collect= njconst&file= 1844_bebout&page=0001 (last visited on Mar. 6, 2014).  The Constitution was ratified on July 2, 1776, only eight days after the appointment of the Constitutional Convention Committee.  Ibid.  "This haste may have been due partly to the arrival of the British Fleet off Sandy Hook."  Ibid.

Constitution,[2] both contained provisions setting forth limited

judicial terms of office, none of which exceeded seven years,

and contained no provision for compulsory retirement.  See

www.state.nj.us/njfacts/njdoc10.htm (last visited on Mar. 6,

2014) (discussing the history surrounding the ratification of

the 1776 Constitution); DePascale v. State, 211 N.J. 40, 48

(2012) (discussing the history surrounding the ratification of

the 1776 and 1844 Constitutions).

By the 1940's there was wide agreement that our

complicated, rigid court system, modeled after the discarded

pre-colonial English legal tribunals, and "characterized by a

multiplicity of courts, overlapping functions of judges, and

lack of unified administrative direction," desperately needed

reform.  4 Proceedings of the Constitutional Convention of 1947,

at 595, 121 (1952) ("[O]ur court system[] was the most

antiquated and intricate that exist[ed] in any considerable

community of English-speaking people.");[3] Symposium, The "New

Judicial Federalism" and New Jersey Constitutional

Interpretation, 7 Seton Hall Const. L.J. 823, 823 (1997) ("Prior

---

[2] There is no mandatory retirement age for judges appointed under Article III, Section 1 of the Federal Constitution.

[3] All five volumes of these proceedings are available at http://slic.njstatelib.org/new_jersey_ information/ searchable_publications_0 (last visited on Mar. 6, 2014).

to the convention in 1947, New Jersey's judicial system was described as the worst in the country.").

In 1941, in response to the escalating calls for reform, the Legislature appointed a Commission to study the revision of the State Constitution. <u>L.</u> 1941, Joint Resolution No. 2 (Nov. 18, 1941). In its May 1942 report, the Commission, chaired by Senator Robert Hendrickson, recommended the adoption of an entirely new State Constitution, and submitted a draft of a revised constitution, which included sweeping changes to the court system. <u>Report of the Commission on Revision of the New Jersey Constitution</u>, at 21-25 (May 1942).[4] Pertinent for present purposes, the Commission recommended the appointment of judges for a trial term, and then, if reappointed, that they have tenure during good behavior. <u>Id.</u> at 22. The Commission also recommended adoption of a compulsory retirement age, that is, that "[a]ll members of the judiciary shall retire upon reaching the age of seventy years." <u>Ibid.</u>

In accordance with its recommendations, the Commission's draft of the revised Constitution included a provision in the proposed Judicial Article that "[n]o justice or judge of any

---

[4] Available at http://lawlibrary.rutgers.edu/cgi-bin/diglib.cgi?collect=njconst&file=1942_comm&page=0001 (last visited on Mar. 6, 2014). Reprinted in 4 <u>Proceedings of the Constitutional Convention of 1947</u>, <u>supra</u>, at 556-65.

court shall continue in office after he has attained the age of seventy years." Id. at 48 (proposed art. V, § 5, ¶ 3). The draft also included a proposed Schedule Article to facilitate the Court's transition from the 1844 Constitution to the newly proposed constitution, including a provision for the appointment of the "justices" of the new Supreme and Superior Courts from the "persons then holding the offices[.]" Id. at 56 (proposed art. XI, § 4, ¶ 1) (emphasis added). The proposed Schedule Article included a provision that "[n]othing in this section shall be construed, however, to permit any justice to continue in office after attaining the age of seventy years." Ibid. (proposed art. XI, § 4, ¶ 1).

In 1943, the Legislature was empowered to act as a limited constitutional convention. See Revised Proposed Amendments of 1944.[5] The Legislature's draft of the Judicial Article to the proposed 1944 revised Constitution and the proposed Schedule Article closely followed the Commission's recommendations. Compare 4 Proceedings of the Constitutional Convention of 1947, at 560-65, with id. at 566-74. However, in its proposed Judicial Article, the Legislature added a recall provision to

---

[5] Available at http://lawlibrary.rutgers.edu/cgi-bin/diglib.cgi?collect=njconst&file=1944_rev&page=0001 (last visited on Mar. 6, 2014). Reprinted in 4 Proceedings of the Constitutional Convention of 1947, supra, at 566-74.

the Commission's draft proposal on compulsory retirement:

> No Justice of the Supreme Court or of the Superior Court shall continue in office after he has attained the age of seventy years; but, subject to law, he may be assigned by the Chief Justice to temporary service in the Supreme Court or in the Superior Court, as need appears.
>
> [L. 1944, c. 92 (emphasis added); (proposed N.J. Const. of 1944 art. V, § 5, ¶ 5).]

The Legislature also changed the age under which existing justices and judges could be reappointed under the new Constitution from seventy years, as proposed by the Commission in its Schedule Article, to seventy-five years, and explicitly banned reappointment thereafter:

> No such Justice of the Superior Court who has been reappointed shall continue in office after he has attained the age of seventy-five years.
>
> [L. 1944, c. 92; (proposed N.J. Const. of 1944 art. XI, § 4, ¶ 1).]

However, the voters rejected the Legislature's proposed revised Constitution during the November 1944 election. 4 Proceedings of the Constitutional Convention of 1947, supra, at 566. Significantly, however, there is no indication in any of the historical sources, including the Proceedings on the Constitutional Convention of 1947, that the voters had objected to the recall of retired judges.

On June 12, 1947, the State convened another

Constitutional Convention, as approved by the voters by referendum. 1 _Proceedings of the Constitutional Convention of 1947_, at 1-2; 2 _Proceedings of the Constitutional Convention of 1947_, at 946. During his opening remarks, Governor Alfred E. Driscoll advised the delegates to limit the new State Constitution "to a statement of basic fundamental principles[,]" and to avoid the problems created under the State Constitution of 1844 by following the Federal Constitution's "ageless virtue of simplicity." 1 _Proceedings of the Constitutional Convention of 1947_, _supra_, at 7.

During the open meetings and public hearings conducted in June and July 1947 by the Constitutional Convention's Committee on the Judiciary (the Committee charged with drafting the proposed articles on the judiciary), the issue of the adoption of a fixed compulsory retirement age for judges was a significant topic of discussion. 4 _Proceedings of the Constitutional Convention of 1947_, _supra_, at 37, 135, 167-68, 190, 208, 330, 342, 429, 486. Some commenters, including Governor Driscoll, argued in favor of compulsory retirement at age seventy, other commenters argued for voluntary retirement at age sixty-five and requiring mandatory retirement at age seventy, and others argued for voluntary retirement at age seventy and mandatory retirement at age seventy-five. 4

A-0630-12T1

Proceedings of the Constitutional Convention of 1947, supra, at 429, 37, 342, 486; id. at 166-68, 190, 330, 486; id. at 135-36, 190, 208, 486.

There was also some much more limited discussion on the question of whether a judge, who had retired at the compulsory retirement age, could be recalled. For example, Vice-chairman Nathan L. Jacobs, who later became a New Jersey Supreme Court Justice, took note of the federal system under which a judge can retire, but be subject to recall by the Chief Justice. Id. at 168. Jacobs said that Justice Van Devanter, after his retirement from the United States Supreme Court, had been permitted to sit as a trial judge which "carried with it the weight of a former Supreme Court Justice," and that was "the type of case, following Dean [Roscoe] Pound's suggestion of using retired judges in celebrated cases, where you might want the public to feel a respect greater than it might toward an ordinary trial judge in that one particular district." Ibid. Jacobs commented that "even if you do have a so-called compulsory retirement age, you may make adequate provision for allowing the court to use these retired judges to the extent of their capacities." Id. at 169.[6]

---

[6] Jacobs, although acknowledged as the "principal sponsor of mandatory retirement" by Morris M. Schnitzer, was also later the

(continued)

Additionally, Justice Frederic R. Colie responded to a query as to whether the "situation of [judicial] overwork" might be alleviated by "drafting some of the very able and capable" judges who were forced to retire at age seventy-five, saying that:

> I think that judges who are retired, either voluntarily or because they have reached the age limit, should be kept on the roll, the state roll of the judiciary, so that they can do as they do in Connecticut. There they are sort of referees, or masters, and may be called in by the Chief Justice when the occasion arises, to handle cases.

> [Id. at 214.]

Significantly, several commentators, including Governor Driscoll, advised the Committee during the open sessions to leave the particular details of judicial retirement to the

---

(continued)
primary architect of creating the recall provisions at issue. 4 Proceedings of the Constitutional Convention of 1947, supra, at 1; Conversations with Morris M. Schnitzer, 47 Rutgers L. Rev. 1391, 1401 (1995); see also post at 28-29. Justice Jacobs, by then serving on our Supreme Court, "promoted the idea as a way of dealing with emergencies and thereafter as a way of enlisting economical judicial service." Conversations with Morris M. Schnitzer, supra, 47 Rutgers L. Rev. at 1401-02. Thus, although Schnitzer, who served as the Technical Advisor to the Committee on the Judiciary, rejected the idea that recall of judges over age seventy was contemplated by that body, Justice Jacobs, who served as the Vice-chairman of the committee and was "the author of every draft of the Judicial Article," certainly saw no constitutional conflict between the mandatory retirement provision in the Constitution and the recall statute. Id. at 1391, 1393, 1401-02.

A-0630-12T1

Legislature.  <u>Id.</u> at 429, 211, 265.  For example, Dean Roscoe Pound, a distinguished legal scholar and former Dean of Harvard Law School, advised that:

> If there is anything that needs to be borne in mind in the Constitution it is not to put in too much.  Robert Louis Stevenson said, the difference between Homer and the ordinary poet was that Homer knew what to leave out.  The difference between the man who writes a good constitution and one who doesn't is that the former knows what to leave out.  Amending a constitution is a slow business, and the way to achieve a thing that has to be achieved is on the basis of experience by those who have the experience.  Don't, therefore, lay down a hard and fast elaborate scheme of courts, their boundaries rigidly defined, and their personnel rigidly defined.  The framers of the Constitution of the United States did a very good job when they provided for just one court and left the rest to legislation . . . .

> [<u>Id.</u> at 113.]

On July 24, 1947, the Committee published its first draft of the Judicial Article, which provided in relevant part that "[s]uch Justices and Judges shall be retired upon attaining the age of seventy years."  2 <u>Proceedings of the Constitutional Convention of 1947</u>, <u>supra</u>, at 1168.  There was no provision for the recall of retired judges for temporary service.  In the proposed Schedule Article, the Committee provided that "[n]o Justice of the new Supreme Court or Judge of the General Court shall, however, hold his office after attaining the age of

seventy years."  Id. at 1170.[7]

The Committee presented the final draft of the proposed Judicial and Schedule Articles to the Convention on July 31, 1947.  2 Proceedings of the Constitutional Convention of 1947, supra, at 1173.  The compulsory retirement provision in the Judicial Article remained unchanged.  Id. at 1175.  The Schedule provisions were changed, and provided in relevant part: "No Justice of the new Supreme Court or Judge of the General Court shall hold his office after attaining the age of seventy years, except, however, that such Justice or Judge may complete the period of his term which remains unexpired at the time the Constitution is adopted."  Id. at 1176 (emphasis added).

In its report on its final draft, the Committee set forth that a noteworthy feature of the proposed Judicial Article is that "[e]xcept for incumbent judges, who will serve out their terms, Justices and Judges of the Supreme and Superior Courts must retire at 70, the Legislature to prescribe pensions."  Id. at 1181, 1189.[8]  With regard to the proposed Schedule Article,

---

[7] During the final open public session on July 30, 1947, several individuals expressed their views on the proposed compulsory retirement age of seventy.  4 Proceedings of the Constitutional Convention of 1947, supra, at 500, 515-16, 523-24, 531, 542-43. Additionally, Robert Carey, a former Hudson County Judge, argued that retired judges should be placed on an inactive list and subject to recall by the Chief Justice.  Id. at 543.

[8] Our Court "has often relied on the Judiciary Committee Report

(continued)

12

the Committee explained:

> The Schedule Article is intended to provide for the transition between the present and the new judicial branches of government. <u>It will govern incumbent judges until the expiration of their terms</u>, assigns the clerical personnel of existing state courts, transfers the files of pending litigation and makes such other specific provisions as are necessary <u>until the new Judicial Article is completely in effect</u>.
>
> [<u>Id.</u> at 1195 (emphasis added).]

The Committee also explained that with regard to "the text and scope of the constitutional provisions governing the judiciary," it had observed the following two considerations:

> First:  Constitutions should deal with fundamentals, not details.  The organic law should establish the framework of government, leaving the body and content to be supplied by legislation.
>
> Second:  The function of a Judicial Article in a Constitution is to create a system of courts, not to write or change the law which those courts will administer or enforce. The Committee was as concerned with avoiding revision of the substantive law, however urgent and necessary, as it was careful to preserve intact the right to trial by jury and the scope and extent of the judicial power.

---

(continued)
as an authoritative source" of constitutional intent.  <u>Henry v. N.J. Dep't of Human Servs.</u>, 204 <u>N.J.</u> 320, 349  n.4 (2010) (Rabner, C.J., concurring).  <u>But see</u> <u>Winberry v. Salisbury</u>, 5 <u>N.J.</u> 240, 248 (criticizing reliance on the Committee report), <u>cert. denied</u>, 340 <u>U.S.</u> 877, 71 <u>S. Ct.</u> 123, 95 <u>L. Ed.</u> 638 (1950).

A-0630-12T1

[*Id.* at 1180-81.]

Thus, although the recall of judges over age seventy was a concept about which members of the Convention were obviously aware if only by virtue of its inclusion in the 1944 proposed constitution, it was also one which they chose not to consider, delegating that detail, instead, to the Legislature.

In November 1947, the voters ratified the Constitution adopted by the Constitutional Convention. The Judicial Article provides in relevant part that:

> The Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of seven years and upon reappointment shall hold their offices during good behavior. <u>Such Justices and Judges shall be retired upon attaining the age of seventy years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law.</u>
>
> [<u>N.J. Const.</u> art. VI, § 6, ¶ 3 (emphasis added).]

The Schedule Article provides in relevant part that:

> Subsequent to the adoption of this Constitution the Governor shall nominate and appoint, with the advice and consent of the Senate, a Chief Justice and six Associate Justices of the new Supreme Court from among the persons then being the Chancellor, the Chief Justice and Associate Justices of the old Supreme Court, the Vice Chancellors and Circuit Court Judges. The remaining judicial officers enumerated and such Judges of the Court of Errors and Appeals as have been admitted to the practice of law in this

A-0630-12T1

> State for at least ten years, and are in
> office on the adoption of the Constitution,
> shall constitute the Judges of the Superior
> Court.  The Justices of the new Supreme
> Court and the Judges of the Superior Court
> so designated shall hold office each for the
> period of his term which remains unexpired
> at the time the Constitution is adopted; and
> if reappointed he shall hold office during
> good behavior.  <u>No Justice of the new
> Supreme Court or Judge of the Superior Court
> shall hold his office after attaining the
> age of seventy years, except, however, that
> such Justice or Judge may complete the
> period of his term which remains unexpired
> at the time the Constitution is adopted.</u>
>
> [<u>N.J. Const.</u> art. XI, § 4, ¶ 1 (emphasis
> added).]

II. <u>Legislation:  The Recall Statute</u>

Thus, the Legislature, in addition to the Senate's constitutional power to confirm gubernatorial nominations to the bench, <u>N.J. Const.</u> art. VI, § 6, ¶ 1; <u>In re Mathesius</u>, 188 <u>N.J.</u> 496, 522 (2006), also has the constitutional authority to set judicial salaries, <u>N.J. Const.</u> art. VI, § 6, ¶ 6 and to make provisions for pensions, <u>N.J. Const.</u> art. VI, § 6, ¶ 3.  To that end, in 1948 the Legislature carried out the constitutional mandate of providing pensions for justices and judges who were subject to mandatory retirement at age seventy.  <u>L.</u> 1948, <u>c.</u> 391 (codified at <u>N.J.S.A.</u> 43:6-6.4 to -6.10 (now repealed)).  There was, however, no provision in the 1948 Act for the recall of retired judges.

In 1973, the Legislature enacted the "Judicial Retirement System Act," N.J.S.A. 43:6A-1 to -46. L. 1973, c. 140. The Act included a provision for mandatory retirement at age seventy, N.J.S.A. 43:6A-7, and provisions regarding the age at which a judge was eligible for voluntary retirement, N.J.S.A. 43:6A-8 to -11. Significantly, N.J.S.A. 43:6A-13(b) (now amended) provided for the recall of judges who had not attained the age of seventy, as follows:

> [a]ny judge retired on pension, except a judge of municipal court, who has not attained the age of 70 years, may, with his consent, be assigned by the Chief Justice to sit in any court but the Supreme Court, or in the case of a retired justice of the Supreme Court, to sit in any court.
>
> [L. 1973, c. 140.]

At the request of the Supreme Court, the Bar Institute and Law Center of New Jersey prepared a formal report on the constitutional issues concerning the recall of judges past the age of mandatory retirement; it recommended passage of legislation permitting same. See The Bar Institute and Law Center of New Jersey, Recall of Judges Past the Age of Mandatory Retirement: An Examination of the Pertinent Issues (October 1974). Its October 24, 1974 report was submitted to the Court at its November 12, 1974 Administrative Conference. Shortly thereafter, in 1975, the Legislature amended N.J.S.A. 43:6A-

13(b)[9] to remove the restriction against recalling judges over the age of seventy, as follows:

> Subject to rules of the Supreme Court[] . . . any judge of the superior court[] . . . who has retired on pension may, with his consent, be recalled by the Supreme Court for temporary service within the judicial system other than the Supreme Court.
>
> [L. 1975, c. 14.]

The Sponsor's Statement to the bill explains that:

> This bill removes the restriction on the employment of retired judges who are 70 years of age or older on special assignments by the Chief Justice in the same manner as retired judges under 70 years of age may presently be assigned.
>
> The New Jersey Constitution in Article VI, Section VI, paragraph 3 requires that judges retire at age 70. This mandatory retirement does not however prevent the utilization of such senior judges on a special assignment basis, if they so desire, at the pleasure of the Chief Justice.
>
> Permitting the assignment of senior judges would help speed the administration of justice and, by securing the benefit of years of judicial experience, increase the quality of justice.
>
> [Sponsor's Statement to Assembly Bill No. 1419, at 2 (April 1, 1974).]

---

[9] Similar statutory provisions were later enacted for the recall of retired Workers' Compensation judges, N.J.S.A. 34:15-49(a), and Administrative Law judges, N.J.S.A. 52:14F-4, who had not yet reached the age of eighty.

A-0630-12T1

Thus, the Legislature has authorized the Supreme Court to recall retired judges, who were appointed in accordance with the Constitution, for temporary assignment - a practice that has been in existence since 1973, for judges younger than seventy, L. 1973, c. 140, and since 1975, for judges who had attained the age of seventy. N.J.S.A. 43:6A-13(b). Prior to this appeal, the recall statute, N.J.S.A. 43:6A-13, has never been challenged.[10]

III. Implementation of Statute by the Supreme Court

Since 1975, our Supreme Court has, without challenge, recalled a great number of retired judges to temporarily serve at all levels of our court system. Effective September 1, 2001, the Administrative Office of the Courts (AOC) established in Directive #12-01, the Judiciary's "Policy Governing Recall for Temporary Service Within the Judicial System", which, in its introductory passage, acknowledges the importance of the recall procedure in fulfilling the Court's constitutional mandate to "'see that the public interest is fully served by the proper functioning of this vital branch of our government[,]'" Henry, supra, 204 N.J. at 353 (Rabner, C.J., concurring) (quoting

---

[10] Minor revisions to N.J.S.A. 43:6A-13 were made by L. 1981, c. 470, § 7, and L. 1990, c. 45, § 1, but no substantive changes were made to the authority of the Supreme Court to recall justices and judges.

Thurber v. City of Burlington, 191 N.J. 487, 499 (2007)

(internal citations omitted)):

> Over the years, the Judiciary has benefited greatly from the willingness of retired judges to be recalled for judicial service. Recall judges provide stability and continuity for the work of the Judiciary by accepting assignments for special projects and programs, so that judges on permanent assignment are not diverted from their primary responsibilities.
>
> [AOC Directive #12-01.]

The AOC policy establishes detailed and comprehensive procedures governing recall service pursuant to N.J.S.A. 43:6A-13, including, among other things, a screening and approval process; a limitation on compensation; a bar on service beyond a retired judge's eightieth birthday; and a complete severance from "of counsel" associations. Ibid. In addition to requiring medical clearance, the policy enumerates other qualifications governing eligibility of candidates for recall service. Moreover, recall judges remain subject to strict judicial guidelines; are bound by the ethical restrictions on judges set forth in N.J.S.A. 52:13D-17; and must comply with all of the provisions of the Code of Judicial Conduct governing full-time judges, Code of Judicial Conduct, Canon 7. See In re Dileo, 216 N.J. 449, 467 (2014) ("Every judge is duty bound to abide by and enforce the standards in the Code of Judicial Conduct.").

A-0630-12T1

Depending on the staffing needs of the vicinages, the Supreme Court issues orders recalling judges, which are published in the New Jersey Law Journal and posted on the judiciary website. By law, the Superior Court consists of 443 judges. N.J.S.A. 2B:2-1(a). There are currently 398 active Superior Court judges, including four Tax Court judges assigned to the Superior Court, representing a vacancy rate of about thirteen percent. As of April 1, 2014, seventy-three recalled judges are temporarily assigned to the Superior Court.[11]

IV. Constitutionality of the Recall Statute

A. Principles of Review

We consider defendant's constitutional challenge to N.J.S.A. 43:6A-13(b) in light of well-settled principles of review. First and foremost, "'[a] statute is presumed to be

---

[11] A review of the recall orders reveals that, as needed, some judges are recalled to specific assignments for short periods of time, and others serve on more general assignment for longer, albeit temporary terms. Thus, it is highly likely that some of the assignments might overlap, but that only one judge would be sitting in the position at any given time. We do not view these temporary assignments, as the dissent intimates, as unlawfully increasing the number of statutorily-authorized judicial positions, or extending their terms of office. Recall judges do not, by virtue of their assignment, "hold" an office that could become vacant upon termination of their powers either by death or operation of law. Indeed, it is only upon his or her recall in accordance with a statute as authorized by the Constitution that a judge may exercise any judicial power whatsoever, and this only during the period specified in the assignment and subject to whatever other conditions the Legislature sees fit to enact and the Supreme Court deems appropriate to impose.

constitutional and will not be declared void unless it is clearly repugnant to the Constitution.'" Trautmann ex rel. Trautmann v. Christie, 211 N.J. 300, 307 (2012) (quoting Newark Superior Officers Ass'n. v. City of Newark, 98 N.J. 212, 222 (1985)). "The strong presumption of constitutionality that attaches to a statute can be rebutted only upon a showing that the statute's 'repugnancy to the Constitution is clear beyond a reasonable doubt.'" Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 285 (1998) (quoting Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 388 (1959)), cert. denied, 527 U.S. 1021, 119 S. Ct. 2365, 144 L. Ed. 2d 770 (1999). The burden is on the party challenging the statute to demonstrate clearly that it violates a constitutional provision. DePascale, supra, 211 N.J. at 63; Bd. of Educ. v. Caffiero, 86 N.J. 308, 318, appeal dismissed, 454 U.S. 1025, 102 S. Ct. 560, 70 L. Ed. 2d 470 (1981).

"The Constitution is, above all, an embodiment of the will of the People, and this Court's responsibility as final expositor is to ascertain and enforce that mandate." Gallenthin Realty Dev., Inc. v. Bor. of Paulsboro, 191 N.J. 344, 359 (2007). The constitution should be construed to "'achieve its dominating purpose'" and, in this regard, "'[i]ts words should be interpreted in the sense most obvious to the common

21

intelligence, because a matter proposed for public adoption must be understood by all entitled to vote.'"  Opinion of Justices, 284 N.E.2d 908, 912 (Mass. 1972) (quoting Lincoln v. Sec. of Commonwealth, 93 N.E.2d 744, 747 (Mass. 1950)).  Policy and practical matters, though not reasons in themselves to control constitutional interpretations, nevertheless do bear on the interests and wishes of the people and, to that extent, should be taken into account.

By the same token, in ascertaining the constitutionality of a statute, courts presume that "'the [L]egislature acted with existing constitutional law in mind and intended the [statute] to function in a constitutional manner.'"  Gallenthin Realty Dev., Inc., supra, 191 N.J. at 359 (quoting State v. Profaci, 56 N.J. 346, 349 (1970)).  Principles of statutory construction obligate courts to interpret statutes to avoid unconstitutional applications.  N.J. Dep't of Envtl. Prot. v. Huber, 213 N.J. 338, 371 (2013).  It is thus the court's duty "to construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation."  Profaci, supra, 56 N.J. at 350.

B.  Applicability of the Schedule Article

In arguing that N.J.S.A. 43:6A-13(b) contravenes the Schedule Article of our State Constitution, defendant relies on

prohibitory language in the provision reciting that "no Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years . . . ." N.J. Const. art. XI, § 4, ¶ 1. While such an express ban on "hold[ing] office" would otherwise be a compelling consideration in determining whether a recall statute is constitutional, see Edward A. Hartnett, Ties in the Supreme Court of New Jersey, 32 Seton Hall L. Rev. 735, 767-68 (2003), the cited language in our Schedule Article applies exclusively to "the incumbent judges who held their judicial offices at the adoption of the Constitution," and therefore has no bearing here. Lloyd v. Vermeulen, 22 N.J. 200, 209 (1956).

The conclusion that the provisions in the Schedule Article do not apply to current judges is overwhelmingly supported by the plain language, which contains phase-in provisions designed to facilitate a smooth transition to the new Constitution and applying only to incumbent judges in 1947. As the Court in Lloyd, supra, 22 N.J. at 209-10,[12] found, the provisions in the Schedule Article specifically provide that

_____

[12] Interestingly, several of the Justices in Lloyd, including Justice Jacobs, who wrote the opinion, and Chief Justice Vanderbilt, were well-qualified to discuss the framers' intent as they had been members of the Committee on the Judiciary or presenters during the Constitutional Convention.

the justices of the new Supreme Court and the judges of the Superior Court so designated shall hold office each for the period of his term "which remains unexpired at the time the Constitution is adopted" and if reappointed shall hold office during good behavior. This sentence would appear to obliterate any lingering doubts, for its terminology was well chosen to effectuate the general understanding that in Art. XI, Sec. IV, par. 1, the framers were dealing with the terms and tenure of the incumbent judges (who held judicial offices at the adoption of the Constitution) and no others; indeed it seems to us that it is hardly susceptible of any other interpretation. The fourth and final sentence provides that no justice of the new Supreme Court or judge of the Superior Court shall hold his office after attaining the age of 70 years, except, however, that such justice or judge may complete "the period of his term which remains unexpired at the time the Constitution is adopted." Here, again, the framers adequately displayed that they were dealing with the incumbent judges who held judicial offices at the adoption of the Constitution.

[Id. at 209-10 (quoting N.J. Const. art. XI, § 4, ¶ 1).]

That interpretation is also overwhelmingly supported by the recorded intent of the framers who drafted the provision. Id. at 206-07. Most notably, in its report on the final draft, the Committee specifically set forth that the Schedule Article "will govern incumbent judges until the expiration of their terms . . . and makes such other specific provisions as are necessary until the new Judicial Article is completely in effect." 2

Proceedings of the Constitutional Convention of 1947, supra, at 1195.  Once the incumbent judges' terms expired, the provisions in the Schedule Article became void.

Therefore, in enacting N.J.S.A. 43:6A-13(b), the Legislature, as explained in the Sponsor's statement, properly considered whether the recall of retired judges who had attained the age of seventy would conflict with the mandatory retirement provision in the Judicial Article, which applies to current judges and justices, and did not consider the provisions in the Schedule Article, which does not.  Sponsor's Statement to Assembly Bill No. 1419, supra, at 2.  We therefore conclude the Schedule Article has no applicability here and, as such, affords no basis for defendant's constitutional attack on the recall statute.

C.  The Judicial Article

Although, as noted, neither raised nor briefed by defendant, see Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), we next consider whether the recall of retired judges who have attained the age of seventy would conflict with compulsory retirement under the Judicial Article.

First, to determine the meaning of a constitutional provision, courts look "to the precise language used by the drafters."  State v. Trump Hotels & Casino Resorts, Inc., 160

A-0630-12T1

N.J. 505, 527 (1999). The plain language of the Judicial Article simply provides that "[s]uch justices and judges shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3. In pointed contrast to the prohibitory language in the Schedule Article, the phrase "shall be retired," is mandatory, clearly requiring compulsory retirement from a permanent position. However, it does not bar a retired judge from being recalled for temporary service. See Gallenthin Realty Dev., Inc., supra, 191 N.J. at 359 ("[T]he surest indicator of [] intent is a provision's plain language").

We discern a clear, compelling distinction between the proscriptive language in the Schedule Article against "hold[ing] office" and the "shall be retired" terminology used in the Judicial Article. For example, in an advisory opinion upholding the constitutionality of legislation authorizing the recall of retired judges, the Massachusetts Supreme Court found it was "significant" that the proposed constitutional amendment requiring compulsory retirement at age seventy did "not provide that a judge shall not hold office after reaching a certain age." Opinion of Justices, supra, 284 N.E.2d at 912-13.

Similarly here, the compulsory retirement provision in the Judicial Article contains no language, express or even implied, banning the temporary recall of retired judges. Indeed, it is

noteworthy that the Judicial Article deliberately avoids use of the proscriptive phrase ("shall [not] hold office") contained in the Schedule Article. When the enacting body "has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." G.E. Solid State v. Dir., Div. of Tax'n, 132 N.J. 298, 308 (1993).

There is nothing intrinsic in the definition of "retire" to suggest its incompatibility with temporary recall service. On the contrary, in the dictionary definition then current at the drafting of the 1947 Constitution, "retire" means to "withdraw from office, a public station, business, or the like[.]" Merriam-Webster's New International Dictionary Unabridged 2128 (2d ed. 1934). Similarly, in the version of Black's Law Dictionary that most closely preceded the Constitution's adoption, "retire" means "to withdraw from active service as an officer of the army or navy; to separate, withdraw, or remove." Black's Law Dictionary, 1550 (3d ed. 1933). In the next version of Black's Law Dictionary, published in 1957, the definition of "retire" remained the same. Black's Law Dictionary 1479 (4th ed. 1957). Thus, while the popular notion continues to date that a retiree is no longer "active" in his or her work or profession, and is ready for immediate annuity or pension, the term need not imply abandonment forever, as demonstrated by the

27                                                              A-0630-12T1

retention of title to the office.

Stripped of its plumage, the dissent's contrary construction boils down to this: the plain language of the Judicial Retirement paragraph creates an irrevocable alienation of pensioner from title, a kind of sequestration, worse yet quarantine, rendering the judicial retiree incognito, isolated and idle, relegated to some sort of professional limbo, yet imprisoned by all the ethical restraints of a status and an office that somehow no longer exists.  Nothing in the language of the Judicial Article, or its intended purpose, however, compels this overly harsh result.

In fact, and most significantly, defendant makes no claim that the retirement provision bars the recall of any retired judge other than one having attained the age of seventy.  Yet, if the term "retire" had any proscriptive intent, it would be interpreted as banning the temporary recall of any retired judge, regardless of age.  No one, however, has ever advocated this position other than our dissenting colleague who, in a footnote, finds himself tethered to that result — a captive of his own unforgiving reasoning.  We therefore conclude that retirement and temporary recall assignments are conceptually different and there is no constitutional conflict between mandatory retirement for age, under which retired judges receive

a pension allowance in accordance with N.J.S.A. 43:6A-8 to -11, not a salary, and are no longer members of the retirement system, N.J.S.A. 43:6A-5, and recalling a judge for temporary service, where they are paid a per diem rate, N.J.S.A. 43:6A-13(c).

The recall of retired judges has been upheld by other state courts. The Supreme Judicial Court of Massachusetts in 1972, in response to questions posed by the State Senate, answered that a proposed bill permitting the temporary service by certain retired justices and judges would not, if enacted, be in contravention of a proposed constitutional amendment almost identical to the provision of the New Jersey Constitution at issue here, providing for the compulsory retirement of all judges at age seventy. Opinion of Justices, supra, 284 N.E.2d at 908-12. In rendering its advisory opinion finding no constitutional conflict, the Court emphasized that the language did not specifically require that the office become vacant and distinguished provisions in other state constitutions expressly prohibiting actual office holding by a person over the age of seventy. Id. at 912.

In Pickens v. Johnson, 267 P.2d 801 (Cal. 1954), the Supreme Court of California held that the temporary assignment of a retired judge for recall service with consent does not

effectuate an extension of his or her term of office but rather merely vests in him or her the powers of a judge of the particular court for the term of the assignment. Id. at 805. The Court held that the constitutional provision authorizing the Legislature to establish a judicial retirement system included the power to provide a system for retired judges to be subject to recall for judicial service:

> It would seem to be beyond question that the provision for the assignment and service of a retired judge in accordance with the statute bears a reasonable relationship to a system of judges' retirement. It is inherently connected with the problems of the administration of justice under which the state, in consideration for the retirement allowance, may invoke the assistance of retired personnel of the judicial department in emergencies found to exist by the chairman of the Judicial Council.

> [Ibid.]

In a similar vein, the Supreme Court of Utah held in Nelson v. Miller, 480 P.2d 467 (Utah 1971), that a statute providing for mandatory retirement of judges and justices was not in conflict with another statute authorizing the recall of a judge or justice back into service from retirement on a case to case basis. Id. at 476. While there was no constitutional provision expressly providing a retirement age, the retirement statute derived from an expressed constitutional provision. Id. at 476-

77. See also Claremont Sch. Dist. v. Governor, 712 A.2d 612, 614-15 (N.H. 1998) (although the Legislature has "no prerogative to invest retired justices over age seventy with the panoply of powers associated with judicial office, it does have the constitutional authority to authorize limited temporary assignment of retired justices over age seventy to ensure the adequate and orderly administration of justice"); Werlein v. Calvert, 460 S.W.2d 398, 402 (Tex. 1970) (holding that in the face of a constitutional provision that the office of every judge and justice shall become vacant when the incumbent reaches the age of 75, such retired judge is not ineligible for temporary assignment to active duty on a case by case basis); State ex rel. New Wash. Oyster Co. v. Meakim, 208 P.2d 628, 632 (Wash. 1949) (holding that although a recalled judge's powers were necessarily limited to those allowed by the Constitution, there was nevertheless no constitutional bar to a statute allowing such recall).[13]

Moreover, as noted, the fact that the recall mechanism was considered at the Constitutional Convention, but not included in the 1947 Constitution, does not establish that the framers

---

[13] Thirty-two states and the District of Columbia provide for mandatory retirement at a given age. Some of these states also have a constitutional provision for the recall of retired judges. See, e.g., The Arizona Constitution, Ariz Const. art. VI, § 20 (2013).

intended to prohibit the practice.  The Constitution does not "resolve all policy problems."  Reilly v. Ozzard, 33 N.J. 529, 539 (1960) ("What is left untouched remains within the jurisdiction of government.").

Instead, a review of the record of the Convention demonstrates that the framers decided to limit the new Constitution to a statement of basic fundamental principles, as they were advised to do, and to leave the resolution of the details, including arguably judicial recall, to the Legislature. 1 Proceedings of the Constitutional Convention of 1947, supra, at 7 (Governor Driscoll's opening statement).  The Committee on the Judiciary specifically explained that, in drafting the judicial articles, it had observed that "Constitutions should deal with fundamentals, not details.  The organic law should establish the framework of government, leaving the body and content to be supplied by legislation."  2 Proceedings of the Constitutional Convention of 1947, supra, at 1181.

In fact, the Constitution specifically conferred on the Legislature the power to establish a system for the retirement of judges.  N.J. Const. art. VI, § 6, ¶ 3, says: "[p]rovisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law."  In accordance with that mandate, the Legislature included in the

"Judicial Retirement System Act," N.J.S.A. 43:6A-1 to -46, some of the other provisions discussed during the convention, but not included in the Constitution. For example, as discussed during the convention, N.J.S.A. 43:6A-8 to -11 provides for voluntary retirement at various ages, with various corresponding years of service, and then mandatory retirement at age seventy.
4 Proceedings of the Constitutional Convention of 1947, supra, at 37, 135, 167-68, 190, 208, 330, 342, 429, 486.

By the same token, there is a logical and rational explanation for placing the recall provision, N.J.S.A. 43:6A-13(b), in the pension statute — notably because only retired judges receiving a pension can be recalled. Moreover, N.J.S.A. 43:6A-13(a) specifically provides that "[n]o member of the retirement system shall, while receiving a pension or retirement allowance pursuant to this act, engage in the practice of law before any of the courts of this State." In that regard, N.J.S.A. 43:6A-13(c) explains that judges who are receiving a pension can receive a per diem payment for a temporary recall assignment. Thus, although conceptually distinct so as to avoid any constitutional conflict, nevertheless, as the California Supreme Court acknowledged in Pickens, supra, recall bears a reasonable relationship to the system of retirement such that the former is properly contained in the pension statute.

In the absence of any conflict between N.J.S.A. 43:6A-13(b) and the Judicial Article, we also find that interpreting the recall statute as constitutional would serve to "effectuate fully and fairly[,]" Trump Hotels & Casino Resorts, supra, 160 N.J. at 527, two of the overriding purposes of the Judicial Article, which are to create flexibility in the court system and to provide for prompt judicial relief. In its report on the final draft, the Committee stated that "[b]y assignment of judges according to ability, experience and need, and apportionment of judicial business among courts, divisions and parts according to the volume and type of cases, judicial resources can be fully utilized and litigation promptly decided." 2 Proceedings on the Constitutional Convention of 1947, supra, at 1180. That language, as the Attorney General points out, is very similar to the Sponsor's Statement accompanying N.J.S.A. 43:6A-13(b). Sponsor's Statement to Assembly Bill No. 1419, supra, at 2. Allowing the recall of retired judges gives the Court the flexibility to utilize experienced judges "to dispense justice expeditiously." Henry, supra, 204 N.J. at 352 (Rabner, C.J., concurring) (discussing temporary assignments).

Additionally, as noted, the recall system, governed by N.J.S.A. 43:6A-13(b) and AOC Directive #12-01, contains strict

requirements that serve to assure the citizens of New Jersey an effective and efficient judicial service. The combination of a mandatory retirement system and a strictly designed temporary recall provision allows those judges who are performing at their full intellectual powers to continue to provide a valuable service to the Court, and to ensure the vigorous judiciary to which the public is entitled.

Finally, although "historical practice alone rarely proves the correctness of a legal proposition[,]" Henry, supra, 204 N.J. at 345 (Rabner, C.J., concurring), the presumption that a statute is constitutional "is enhanced" because N.J.S.A. 43:6A-13(b) has been in effect and has been implemented without challenge or objection for almost four decades. Trump Hotels & Casino Resorts, supra, 160 N.J. at 527.

In fact, hundreds of qualified judges have been temporarily assigned under this provision, and they have undoubtedly issued thousands of rulings, thereby providing the judiciary with a valuable service. See, e.g., Henry, 204 N.J. at 344 (Rabner, C.J., concurring), similarly noting that "[i]n the hundreds of instances when Chief Justices have made temporary assignments to the Court, the practice has never been challenged."

We therefore find that the strong presumption of the validity of N.J.S.A. 43:6A-13(b), which was enacted by the

Legislature, signed into law by the Governor, and implemented by the judiciary, has not been rebutted.

In concluding otherwise, our dissenting colleague, while acknowledging the very weighty burden a constitutional challenger bears, ignores that burden when it comes to his own analysis. Instead of affording the legislation, "every possible presumption" favoring its validity, N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8 (1972), and construing the Constitution's language to achieve its dominating purpose, Gallenthin, supra, 191 N.J. at 359-60, the dissent stretches its definition of "retire" far beyond its true contextual sense and commonly understood meaning to find a constitutional repugnancy "beyond a reasonable doubt."  Harvey v. Bd. of Chosen Freeholders of Essex Cnty., 30 N.J. 381, 388 (1959).  And instead of exercising the "extreme self-restraint" to which our judiciary is accustomed in reviewing legislative enactments for constitutional conflict, McCrane, supra, 61 N.J. at 8, the dissent nails to the cathedral door its exegesis on politics, ageism, and the perceived benefits of youthful replenishment. In the process, the dissent violates the cardinal principle of making every effort to avoid striking down laws duly enacted by the elected branches of government.  In re Incorp. of the Vill. of Loch Arbour, 25 N.J. 258, 264-65 (1957).

A-0630-12T1

Perhaps recognizing the limitations of its own grammatical reading, the dissent unleashes a "separation of powers" broadside against N.J.S.A. 43:6A-13.  See Mt. Laurel Twp. v. N.J. Dep't of Pub. Advocate, 83 N.J. 522, 530 (1980) (separation of powers doctrine is system of checks and balances on the three branches of government); In re Application of Plainfield-Union Water Co., 14 N.J. 296, 308 (1954) (doctrine forbids one branch of government from encroaching on powers of another branch). Waxing eloquently, albeit mistakenly, the dissent posits: given that the nomination and appointment of judges is an executive prerogative, and the Secretary of State signs the commissions and receives the resignations, how can the Legislature, who has only "advice and consent" authority, delegate the power to "appoint" recall judges to the judicial branch?

Putting aside the fact that the issue was not raised below or on appeal, the Executive, whose authority the dissent insists has been "irreparably" arrogated, has never challenged the constitutionality of the recall statute, passed by the Legislature and signed into law by Governor Brendan Byrne on February 14, 1974, L. 1975, c. 14 (amending N.J.S.A. 43:6A-13),[14]

---

[14] The Legislature has on at least two separate occasions amended other provisions of the recall statute, but left the language relevant here intact.  See L. 1981, c. 470, § 7; L. 1970, c. 45, § 1.

and funded by a budget annually approved by each successive governor. See Henry, supra, 204 N.J. at 344 (Rabner, C.J., concurring) (the parties did not object to the temporary assignment to the Supreme Court, nor present arguments as to the constitutionality for the Court to consider). Certainly, if the Executive believed that N.J.S.A. 43:6A-13 transgressed its appointment power, we have no doubt it would have voiced that opinion.

More to the point, gubernatorial authority in this area is neither exclusive nor absolute, but subject to the Senate's "advice and consent" responsibility. N.J. Const., art. VI, § 6, ¶ 1. As the dissent correctly notes, given that "[t]he compartmentalization of governmental powers . . . has never been watertight[,]" State v. Loftin, 157 N.J. 253, 284 (1999) (quoting In re Salaries for Prob. Officers of Bergen Cnty., 58 N.J. 422, 425 (1971)), the separation of powers doctrine "requires . . . a cooperative accommodation among the three branches of government[,]" Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 449-50 (1992).

We believe that N.J.S.A. 43:6A-13 strikes the appropriate compromise by "maintain[ing] the balance [among] the three branches of government, preserv[ing] their respective independence and integrity, and prevent[ing] the concentration

of unchecked power in the hands of any one branch."  David v.
Vesta Co., 45 N.J. 301, 326 (1965).  It also best effects the
overriding purpose of the Constitution's Judicial Article, which
is to empower the judiciary to "function[] effectively in the
public interest."  Winberry v. Salisbury, 5 N.J. 240, 244, cert.
denied, 340 U.S. 877, 71 S. Ct. 123, 95 L. Ed. 638 (1950).

For all these reasons, then, we deem N.J.S.A. 43:6A-13 in
harmony with the Constitution's Judicial Article.  Clearly, in
enacting the recall statute, it cannot be said, and certainly
not beyond a reasonable doubt, that the Legislature violated the
framers' intent and the will of the people as embodied in our
Constitution.

V.

Defendant also argues that the judge erred in denying the
motion to recuse himself from hearing the disqualification
motion based on age, because the judge had a financial interest
(his per diem payment of $300), in the outcome of the motion.
We disagree.  Under the doctrine of judicial necessity, the
judge correctly refused to recuse himself from deciding the
disqualification motion.

Rule 1:12-1(e) provides that "[t]he judge of any court
shall be disqualified on the court's own motion and shall not
sit in any matter, if the judge . . . is interested in the event

39

of the action[.]"  Similarly, N.J.S.A. 2A:15-49(d) provides that "[n]o judge of any court shall sit on the trial of or argument of any matter in controversy in a cause pending in his court, when he . . . [i]s interested in the event of such action." "The disposition of a motion for disqualification is 'entrusted to the sound discretion of the trial judge whose recusal is sought.'"  Chandok v. Chandok, 406 N.J. Super. 595, 603 (App. Div.) (quoting Panitch v. Panitch, 339 N.J. Super. 63, 66 (App. Div. 2001)) (internal quotation marks omitted), certif. denied, 200 N.J. 207 (2009).

The resolution of defendant's disqualification affects not only the judge to whom it was addressed, but every other current judge or justice, including retired judges temporarily recalled, and judges who may decide to accept a recall assignment upon retirement.  Rule 1:12-1(e) "speaks to an individual judge's disqualification, not to the disqualification of an entire segment of the bench."  Pressler & Verniero, Current N.J. Court Rules, comment 7.3 on R. 1:12-1 (2014).  As a matter of judicial necessity, therefore, the judge was obliged to hear the disqualification motion based on age, which involved a pecuniary interest applicable to every current and retired judge or justice.  In In re P.L. 2001, Ch. 362, 186 N.J. 368, 393 (2006), the Court held that "[w]hen a statute interferes with the

administration of the judiciary, Superior Court judges and the Justices of this Court cannot escape their constitutional responsibility to decide the validity of the legislation." Additionally, in DePascale, supra, 211 N.J. at 44, the Court noted that "[n]o party has objected to this Court deciding the constitutional issue before us, even though resolution of that issue involves a pecuniary interest touching members of this Court and most of the judiciary." By judicial necessity, the judge was required to decide the motion for disqualification based on his age even though he had a pecuniary interest in the outcome, and therefore properly denied the motion to recuse himself.

## VI.

Lastly, defendant argues that his sentence of nine years with an eighty-five percent parole disqualifier for second-degree robbery was excessive. We disagree.

In sentencing defendant, the court found three aggravating factors: the risk that defendant will commit another offense; the extent of defendant's prior criminal record; and the need to deter defendant and others from violating the law. N.J.S.A. 2C:44-1(a)(3), (6) & (9). In this regard, the court properly considered defendant's "long history of convictions for disorderly persons and indictable offenses, failed attempts at

rehabilitation and a violation of parole."  This was defendant's eighth indictable conviction, and his fourth for robbery — the very crime he was convicted of in this case.  In fact, the judge found that defendant's "recidivism alone warrants th[e] sentence."

Moreover, the evidence overwhelmingly supported the jury's verdict, which is not contested on appeal, that defendant committed second-degree robbery, N.J.S.A. 2C:15-1(a)(1).  There was ample evidence that during the course of the robbery defendant inflicted bodily harm on the victim by placing her in a choke-hold, causing her to lose consciousness and control of her bladder and bowels.

In contrast, the court found no mitigating factors, and determined that the aggravating factors outweighed the nonexistent mitigating factors.  While defendant argues that the court failed to apply one mitigating factor, N.J.S.A. 2C:44-1(b)(7), that he had led a law-abiding life for a substantial period of time before the present offense, the fact remains that in the ten years preceding this offense, defendant accumulated five municipal convictions, multiple arrests, and a bench warrant — behavior that requires a finding that he had not led a "law-abiding life."

We therefore conclude that the court properly followed and

applied the sentencing guidelines and criteria, and that the sentence imposed in the higher end of the range, given the circumstances surrounding the crime and defendant's recidivism, is not manifestly excessive nor does it shock the judicial conscience. State v. Ghertler, 114 N.J. 383, 387-89 (1989).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0630-12T1

**Harris, J.A.D., dissenting.**

I.

Warning: the elegantly pragmatic approach of the able and well-researched opinion of my colleagues may seduce the reader into undiscerning agreement. I urge caution and a willingness to disagree.

The majority endorses the thirty-nine-year utilization of Section 13(b) of the Judicial Retirement System Act (the JRSA), N.J.S.A. 43:6A-1 to -47, as a proper source, and apt means, of conferring judicial power upon septuagenarians who once were Superior Court[1] judges but "retired on pension or retirement allowance" and are then "recalled by the Supreme Court for temporary service within the judicial system other than the Supreme Court." N.J.S.A. 43:6A-13(b). Those familiar with our publicly funded system of dispute resolution recognize that such recall judges "serve[] the people of New Jersey with skill, diligence and integrity." DePascale v. State, 211 N.J. 40, 93 (2012) (Patterson J., dissenting). Alongside active judges, this grey-haired army of retiree jurists — cloaked yet again with their former sovereign authority by N.J.S.A. 43:6A-13(b)

---

[1] Because the present appeal involves the recall of a Superior Court judge, it is unnecessary to address Supreme Court justices and Tax Court judges.

and -13(c) — reliably deliver tangible benefits for "real parties and actual people who are trying to vindicate their rights as they await justice." Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 340 (2010) (Rabner, C.J., concurring). The problem, however, is that the statute — and, inescapably, the long-standing practice of deploying recall troops for temporary judicial service — are both unconstitutional.[2] Accordingly, I dissent.

## II.

### A.

The standard of review that governs this case is formidable: has defendant James Buckner demonstrated, beyond a reasonable doubt, see Gangemi v. Berry, 25 N.J. 1, 10 (1957), that Article VI, Section 6, Paragraph 3 of the New Jersey Constitution (the Judicial Retirement paragraph) was intended by its framers and the people who adopted it in 1947 to not permit the Legislature to authorize reinstatement of this state's

---

[2] For this reason, I would vacate Buckner's conviction, and order a new trial. I recognize that the venerable de facto officer doctrine, see Jersey City v. Dep't of Civil Serv., 57 N.J. Super. 13, 27 (App. Div. 1959), might counsel against this course of action. However, in the interest of fairness and equity, this one litigant, who has successfully demonstrated that the trial judge was without judicial authority, is entitled to such a remedy.

judicial power to pensioner judges?[3]  Because the enabling

legislation —— N.J.S.A. 43:6A-13(b) —— that purports to

accomplish this (1) offends the plain "shall be retired upon

attaining the age of 70 years" language of the Judicial

Retirement paragraph, and (2) irreparably rends the

Constitution's fabric of separation of powers by legislatively

authorizing the Supreme Court —— rather than the Governor —— to

make the selection decisions to implement recalls, the high

threshold of presumptive constitutionality has been surmounted.

Even with awareness of the admonition that it is the

"policy of our law not to invalidate a statute which has been in

force without substantial challenge for many years," I cannot

stand mute when a statute's unconstitutionality is obvious.[4]  In

re Loch Arbour, 25 N.J. 258, 265 (1957).  "It is a familiar rule

---

[3] Buckner's reliance upon the schedule provisions of N.J. Const. art. XI, § 4, ¶ 1, is wholly unpersuasive.  In light of (1) the majority's correct analysis of Lloyd v. Vermeulen, 22 N.J. 200 (1956); (2) the history of the transitional plan from the 1844 Constitution to the 1947 Constitution; and (3) the schedule provision's plain language, I fully subscribe to the majority's rejection of Buckner's attack using this constitutional justification.

[4] Although being compared by the majority to Martin Luther may be flattering, ante at ___ (slip op. at 36) (constructively criticizing the dissent for "nail[ing] to the cathedral door its exegesis on politics, ageism, and the perceived benefits of youthful replenishment"), I prefer the role of the small child who exclaims that the Emperor has no clothes.  Hans Christian Andersen, The Emperor's New Clothes (1837).

of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in our State Constitution the language is the voice of the people." Vreeland v. Byrne, 72 N.J. 292, 302 (1977); see also The Federalist No. 78 (Alexander Hamilton) ("[T]he Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents."). In the present case, I see nothing that permits the placement of executive powers within the orbit of our highest court. The law, while arguably well-informed and foresighted from a policy standpoint, cannot withstand constitutional scrutiny, and we should say so, even after almost four decades of going unchallenged.[5] See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60, 73 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

### B.

The majority observes that the Judicial Retirement paragraph licenses the practice of recalling post-age-seventy

---

[5] See also McCutcheon v. FEC, ___ U.S. ___, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014) (demonstrating judicial resolve, even after almost thirty-eight years of a statute's service, in striking down the aggregate contribution limits imposed by the Federal Election Campaign Act Amendments of 1976, 2 U.S.C.A. 441a(a)(3), because they violate the First Amendment).

former judges because it "does not bar a retired judge from being recalled for temporary service." Ante at ___ (slip op. at 26). However, nothing in the Constitution authorizes it. Does the majority believe that, in the absence of enabling legislation, the Constitution's silence would permit, hypothetically, the implementation of an ad hoc recall-of-retired-judges system by, say, the Supreme Court on its own initiative, or the Governor through an Executive Order, or the Legislature by joint resolution? I doubt it. Thus, the essence of the present analysis focuses not just upon what is left unsaid by the Constitution, but also upon the question of whether the particular statute is a valid exercise of legislative power.

I start with the language of the Constitution's Judicial Retirement paragraph, which, in pertinent part, states the following:

> The Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior . . . . Such Justices and Judges shall be retired upon attaining the age of 70 years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law.
>
> [N.J. Const. art. VI, § 6, ¶ 3 (emphasis added).]

The plain language of the Judicial Retirement paragraph must be construed with thorough attention to the framers' choice of language, noting not only what they included, but also what they excluded from the document presented to, and approved by, the people in November 1947. "The polestar of constitutional construction is always the intent and purpose of the particular provision." State v. Apportionment Comm'n, 125 N.J. 375, 381 (1991). Although a literal reading of a constitutional declaration may be rejected when it is inconsistent with the spirit, policy, and true sense of the declaration, Lloyd v. Vermeulen, 22 N.J. 200, 205-06 (1956), "'the words employed [in the Constitution] have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication . . . .'" Apportionment Comm'n, supra, 125 N.J. at 382 (citation omitted).

The phrase "shall be retired upon attaining the age of 70 years," simply connotes (1) the compulsory abdication of a judicial office; (2) the surrender of judicial power previously conferred by N.J. Const. art. VI, § 1, ¶ 1; and (3) the permanent loss of the ability to exercise — for the benefit of the public — the sovereign functions of government that had previously been made possible by the Governor's selection, with

6

the advice and consent of the Senate.  See N.J. Const. art. VI, § 6, ¶ 1.

To support its reading of the Judicial Retirement paragraph, the majority correctly quotes several vintage definitions of "retire."  Ante at ___ (slip op. at 27-28).  But the majority's chosen dictionary definitions still fail to illustrate the source of recall authority.  Absent express constitutional authorization, the definitional silence is a very thin reed indeed to support the awesome renewal of judicial power to those who formerly wielded it.

I conclude that there is nothing about the plain language of the Judicial Retirement paragraph that supports the majority's view.  Alternatively, the majority "discern[s] a clear, compelling distinction between the proscriptive language in the Schedule Article against 'hold[ing] office' and the 'shall be retired' terminology used in the Judicial [Retirement paragraph]."  Ante at ___ (slip op. at 26-27).  This is comparing apples to oranges.

The majority favorably contrasts the proscriptive use of language in the Schedule Article — "[n]o Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years," N.J. Const. art. XI, § 4, ¶ 1 — with the mere mandatory retirement language

of the Judicial Retirement paragraph —— "[s]uch Justices and Judges shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3. Ante at ___ (slip op. at 26). In the former phrase, where the framers used the word "office," it was clearly limited and intended to punctuate the end of incumbency under the 1844 constitutional framework for those pre-modern-era judges who had transitioned to the Superior Court. The latter phrase was intended to deal with the new regime, and cannot be seen as keeping the door open for temporary recall where its object was to strip judges of their judicial authority at midnight immediately preceding their seventieth birthday.

Another reason why the majority discounts the significance of the absence of express recall authority in the Judicial Retirement paragraph is its interpretation of the provision's evolution. I concede that the majority opinion accurately analyzes the 1947 proceedings of the Constitutional Convention, as far as it goes. In my view, however, it does not go quite far enough. The majority assumes that the Constitution's final-draft silence with respect to recalling retired judges on an as-needed basis was in accord with the generalized philosophy that a constitution should deal with fundamental principles, not details. This is not only speculative, but also it is belied by

the twenty-five-year span (1948 to 1973) that immediately followed the Constitution's adoption, during which there was no recall legislation and no recall judges.

During the constitutional sausage-making that took place in New Brunswick in the summer of 1947, the Constitutional Convention's Committee on the Judiciary participated in hours upon hours of spirited exchanges about court unification; the judicial selection process; trial periods for new judges and tenure; the appropriate age, if any, for a judge's compulsory retirement;[6] and judicial pensions. Yet, there were only a scant few minutes, best characterized as stray comments, devoted to conversations about the use of retired jurists as temporary judicial officers in the proposed new, unified court system. See 4 Proceedings of the Constitutional Convention of 1947 at 168-69; 190; 214-15. On July 30, 1947, one speaker, retired judge Robert Carey[7] (also a Convention delegate and member of the Committee on Rights, Privileges, Amendments and Miscellaneous

---

[6] Some commentators suggested that retirement should be imposed at ages seventy or seventy-five; others recommended life tenure, like federal judges, with no mandatory separation from the bench.

[7] Carey prefaced his remarks by noting that he "expects to practice law for the next 25 years," and would be "in the midst of the celebration of [his] 75th birthday" seven weeks hence, on September 16, 1947. 4 Proceedings of the Constitutional Convention of 1947, supra, at 542.

Provisions), while constructively criticizing the Committee on the Judiciary's age-seventy retirement proposal, stated:

> Why, most men don't get high judicial positions until after they are 58 or 60, and they are 70 before they know it. To put them on the shelf then, or to make them law loafers of the State, what a mistake that would be! I'd say 75 at the lowest, and after 75 retire them. <u>And then put them on the inactive list subject to the call of the Chief Justice, whoever he may be, at all times.</u>
>
> [4 <u>Proceedings of the Constitutional Convention of 1947</u>, <u>supra</u>, at 543 (emphasis added).]

Carey's suggested retirement age was not adopted, and I submit that his recall-equivalent "inactive list" proposal was likewise consigned to the constitutional trashbin.

The framers' failure to devote much attention to a temporary recall provision is understandable; they were struggling with much larger and more complex issues at the time. Nevertheless, the subject of post-retirement judicial service was clearly known to them. Among the sources of information made available to members of the Committee on the Judiciary during their seventeen days of meetings were fifty-five witnesses, plus "some two dozen persons" who presented their views on the Committee's tentative draft of the Judicial Article, together with a wealth of written reports, monographs, and position papers. Among the writings are the proposal of the

New Jersey Committee for Constitutional Revision, which included

a provision "for mandatory retirement at age 70, . . . subject

to possible recall to temporary service as need may appear,"

4 Proceedings of the Constitutional Convention of 1947, supra,

at 580; 28, and a small mention in a June 5, 1947 New Jersey Law

Journal editorial. See id. at 677. Leaving a recall provision

out of the Constitution was neither an inadvertent oversight nor

a nod towards simplicity of draftsmanship.

The majority accurately recounts the evolution of the

Constitution's Judicial Article from the May 1942 report of the

Commission on Revision of the New Jersey Constitution (the

Hendrickson Commission) up to the Judicial Article's actual

drafting in 1947. Ante at ___ - ___ (slip op. at 4-7). Also,

the majority rightly notes that the 1944 Legislature modified

and supplemented the Hendrickson Commission's recommended

judicial retirement language from

> No justice or judge of any court shall
> continue in office after he has attained the
> age of seventy years.
>
> [4 Proceedings of the Constitutional
> Convention of 1947, supra, at 562 (proposed
> art. V, § 5, ¶ 3)]

to

> No Justice of the Supreme Court or of the
> Superior Court shall continue in office
> after he has attained the age of seventy
> years; but, subject to law, he may be

> > assigned by the Chief Justice to temporary service in the Supreme Court or in the Superior Court, as need appears.
>
> [Id. at 569 (emphasis added) (proposed N.J. Const. of 1944 art. V, § 5, ¶ 5).]

However, after observing that the people soundly rejected the proposed 1944 Constitution at the polls, the majority deems it "[s]ignificant[]" that "there is no indication in any of the historical sources, including the Proceedings on the Constitutional Convention of 1947, that the voters had objected to the recall of retired judges." Ante at ___ (slip op. at 7).

What is significant is not the conjectural objection of putative voters, but rather, it is that the 1947 framers purposefully elected to omit the twenty-seven words[8] that would have validated the present recall contrivance. The majority chalks up the loss of this phrase to the principle of constitutional minimalism, but I fail to see how the addition of these utterly unassuming words would have violated Governor Driscoll's call for "limiting our State Constitution to a statement of basic fundamental principles." 1 Proceedings of the Constitutional Convention of 1947 at 7. The framers, and the people, had no problem including detailed managerial

---

[8] Those words are: "but, subject to law, he may be assigned by the Chief Justice to temporary service in the Supreme Court or in the Superior Court, as need appears."

features in the Judicial Article, such as the appointment of an Administrative Director to serve at the pleasure of the Chief Justice, see N.J. Const. art. VI, § 7, ¶ 1; provisions for the Chief Justice's assignment of judges to the various Divisions of the Superior Court, see N.J. Const. art. VI, § 7, ¶ 2; and authorization for the Supreme Court to appoint Clerks for the Supreme and Superior Courts. See N.J. Const. art. VI, § 7, ¶ 3. If these provisions were deserving of inclusion in the Constitution, then a provision for recalling retired judges beyond seventy years of age was equally constitution-worthy.

Accordingly, I conclude that the excision of recall-authorization language that had appeared in the failed 1944 Constitution was purposive, even though there is no express record of its rejection in the public annals of the Committee on the Judiciary.[9] Because the authority to recall retired judges never made it into the Constitution, it may not be invoked sub silentio, legislatively or otherwise.

---

[9] At the conclusion of the Committee on the Judiciary's open sessions, it held five closed executive sessions to consider the testimony and formulate a tentative draft of the Judicial Article. 4 Proceedings of the Constitutional Convention of 1947, supra, at iii. No stenographic record was made of the executive sessions "to [e]nsure the fullest possible discussion," and to allow a "free exchange of views." Id. at iv. As a result, there is no official record of several of the Committee's discussions surrounding the adoption of the draft Judicial and Schedule Articles.

This conscious decision to omit a provision for the recall of judges is bolstered by the Constitutional Convention's rejection of a proposed amendment to the Committee's final draft of the Judicial Article, its so-called Proposal No. 4-1, which included a recall provision. That failed amendment, introduced by Committee member, retired Chief Justice Thomas J. Brogan, contained among its myriad adjustments, in pertinent part, the following:

> Such Justices or Judges shall be eligible for retirement at the age of seventy years, but shall be retired at the age of seventy-five years. Upon the retirement of any such Justice or Judge he shall receive a pension equal in amount to the salary which he is receiving at that time. <u>Such Justice or Judge shall be required, if able so to do, to perform such judicial duties and services as may be required of him by designation or order of the Court of Appeals[.]</u>
>
> [2 <u>Proceedings of the Constitutional Convention of 1947</u> at 1207 (emphasis added) (Amendment No. 1 to Committee Proposal No. 4-1, § VII, ¶ 6).]

Based upon what went into the task of constitution-making at the beginning, and what came out at the end, I cannot agree with the majority that the Judicial Retirement paragraph is fluid enough to embrace the recall of judges who outlive their seventieth birthdays.

A-0630-12T1

C.

Unlike the majority, I take no comfort in the exposition of the temporary recall provisions in other states.  <u>Ante</u> at ___ - ___ (slip op. at 29-32).  In fact, the leading case, <u>Opinion of Justices</u>, 284 <u>N.E.</u>2d 908 (Mass. 1972), while validating proposed legislation authorizing the temporary recall of retired judges of "the several courts of the commonwealth," <u>id.</u> at 908, did so within a governmental framework entirely distinguishable from New Jersey's.  The Massachusetts recall paradigm, completely contrary to New Jersey's open-ended provision,[10] proposed to

---

[10] I call it an open-ended system because it contains no express limits and few guidelines.  For example, <u>N.J.S.A.</u> 2B:2-1 authorizes 443 Superior Court judges.  As of April 1, 2014, there were 398 active-service Superior Court judges (including four Tax Court judges assigned to the Superior Court), <u>see</u> http://www.judiciary.state.nj.us/directory/judgebiographies.pdf (last visited April 7, 2014), plus at least seventy-three temporary recall judges assigned to the Superior Court, <u>see</u> 2012-2014 <u>Notices to the Bar</u>, http://www.judiciary.state.nj.us/ notices/index.htm (last visited April 7, 2014), for a total of at least 471 persons exercising judicial authority in the Superior Court, which is more than legislatively approved.  From these data, it is impossible to compute how many full-time-equivalent judges are deployed.  But even if some of the temporary recall judges merely serve on a part-time or as-needed basis, there are still more persons holding judicial power in the Superior Court than are authorized by the statutory numerical limit of <u>N.J.S.A.</u> 2B:2-1.  Moreover, there is nothing in the recall statute to prevent the recall of dozens, perhaps even hundreds, of additional retired jurists, subject only to the qualifications of the <u>Policy Governing Recall for Temporary Service Within the Judicial System</u>, Administrative Directive #12-01 (July 19, 2001), and budgetary constraints.  Finally, there is no assurance that the choosing of recall judges follows the "most distinctive
(continued)

A-0630-12T1

operate from a list of available jurists, vetted by the Massachusetts Governor with the advice and consent of that state's elected Executive Council (roughly analogous to New Jersey's Senate in its advice and consent modality).  Id. at 909.  We cannot measure the constitutionality of our recall platform from this dissimilar foreign source.

As it turns out, Opinion of Justices appears to have played an important, albeit misleading, role in changing the once accepted view that recall judges were not authorized by the Constitution, and which led to the adoption of N.J.S.A. 43:6A-13(b)'s predecessor statute in 1973.  Once again, the majority's canvass of the legislative history is accurate.  See ante at ___-___ (slip op. at 16-18) (reflecting that before 1975 there was no statutory provision that permitted the recall of a retired judge or justice over the age of seventy years).

---

(continued)
institution of our judicial system — the bipartisan selection of judges." Hon. Arthur T. Vanderbilt, C.J., Famous Firsts in Jersey Jurisprudence: An Acknowledgement of Indebtedness, The Inaugural Lecture of the Harvard Law School Ass'n of N.J. Annual Lecture Series, 22-26 (Feb. 23, 1956) (discussing New Jersey's "distressing experiences" of the breakdown of the judicial appointive process following the adoption of the 1844 Constitution, and the evolutionary response of bipartisan appointments, culminating in the "unwritten tradition" of ensuring a nonpartisan judiciary through the bipartisan selection of judges).

However, some additional history may illuminate how the Supreme Judicial Court of Massachusetts helped get us to this point.

Opinion of Justices was decided on June 29, 1972. Eleven months later, on May 22, 1973, the JRSA became effective. L. 1973, c. 140. Among the many features of the new pension statute was the first authorization for the "assignment" — not recall — of retired judges, but only for those judges who had not attained the age of seventy:

> Any judge retired on pension, except a judge of a municipal court, who has not attained the age of 70 years, may, with his consent, be assigned by the Chief Justice to sit in any court but the Supreme Court, or in the case of a retired justice of the Supreme Court, to sit in any court.
>
> [L. 1973, c. 140, § 13; N.J.S.A. 43:6A-13(b) (later amended by L. 1975, c. 14) (emphasis added).]

A few months later, in a January 31, 1974 New Jersey Law Journal editorial, the Law Journal Board noted that, unlike the senior judge system of the federal courts, "[i]n the New Jersey system no such practice exists." Senior Judges, 97 N.J.L.J. 68 (Jan. 31, 1974). The editorial opined that the Constitution does not prohibit "the rendering of service by . . . retired jurists comparable to that performed by Senior Judges in the federal system." Ibid. Consequently, it "urge[d] that

[N.J.S.A.] 43:6-6.39[11] be amended so as to permit the Chief Justice to assign 'retired' judges, whether they retire over or under the age of 70, to sit in any court other than the Supreme Court and to assign a retired Justice of the Supreme Court to sit in any court."  Ibid.

Two months later, another editorial confessed,

> We have just had our attention called to Opinion of the Justices of the Supreme Judicial Court of Massachusetts, 284 [N.E.2d] 908 (1972), wherein that Court advised the Massachusetts Senate that a bill relating to service by retired judges would not contravene the proposed Massachusetts constitutional amendment, which provided that "upon attaining seventy years of age said Judges shall be retired."
>
> [Judicial Service For Judges Retired At Age 70 Who Wish Such Service, 97 N.J.L.J. 118 (March 21, 1974).]

In light of this decisional law, which supposedly fortified the Law Journal Board's January 31 commentary, the editorial opined:

> Here is a non-controversial proposal in which all can join for bringing back into the judicial system some of our most-experienced judges who are at the peak of their power.
>
> [Ibid.]

---

[11] This statute had been repealed in May 1973 as part of the adoption of the JRSA.  See L. 1973, c. 140, § 45; N.J.S.A. 43:6A-45(q).  Inexplicably, the Law Journal Board was unaware of the repeal and contemporaneous adoption of N.J.S.A. 43:6A-13(b), which allowed for limited assignment of retired judges.

Less than two weeks later, Assemblyman William J. Bate (an attorney and later Passaic County Surrogate) introduced what became Assembly Bill No. 1419, which ultimately was adopted as the present version of N.J.S.A. 43:6A-13(b). The misguided hand of Opinion of Justices indubitably played a role in changing our law.[12]

As I have indicated, Opinion of Justices is not a proper vehicle to interpret our Constitution, even if the language of the judicial retirement provisions of the Massachusetts and New Jersey Constitutions are nearly identical. At the time the Massachusetts justices grappled with the issue, the Massachusetts Constitution had not yet even provided for compulsory judicial retirement upon reaching seventy years of

_____

[12] Another source for this conclusion comes from a 1995 interview with Morris M. Schnitzer, once "the dean of the New Jersey Bar," and a Technical Advisor to the Committee on the Judiciary. Conversations with Morris M. Schnitzer, 47 Rutgers L. Rev. 1391 (1995). In explaining how retired judges in New Jersey came to be subject to recall, Schnitzer stated:

> [T]he Massachusetts Constitution had a mandatory retirement provision much like the 1947 New Jersey Constitution. Once the Massachusetts Supreme Judicial Court decided that retired judges could be recalled, Nat[han] Jacobs, by then on the New Jersey Supreme Court, promoted the idea as a way of dealing with emergencies and thereafter as a way of enlisting economical judicial service.

> [Id. at 1401-02.]

A-0630-12T1

age.  Opinion of Justices, supra, 284 N.E.2d at 911.  The court noted that the proposed constitutional amendment, if adopted, "would require the immediate retirement of almost one-fifth of the present justices of the general trial courts of the Commonwealth."  Ibid. (quotation marks omitted).  In its practical opinion validating the recall of retired judges, the court was rightly concerned that, without the ability to recall judges,

> approval of the proposed amendment would cause the immediate retirement of a substantial number of experienced judges. This would undoubtedly create great confusion and possible chaos throughout our entire judicial system . . . .  To hold that the Legislature would be prevented from recalling retired judges to active service by the proposed amendment would greatly diminish the quality of justice for all.

> [Id. at 913.]

However laudatory this urge to save the Massachusetts judicial system for the benefit of the people it served may be, exigency and pragmatism are insufficient impulses to either suspend our Constitution or fill a power vacuum with a novel solution.  See Janouneau v. Harner, 16 N.J. 500, 514 (1954) (emergencies do not create or enlarge power); see also Commc'ns Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. 229, 260 (App. Div. 2010) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S. Ct. 863, 96 L. Ed. 1153 (1952)).  I eschew

the limited persuasive attributes of <u>Opinion of Justices</u>,[13] and disagree with the majority that it, and any of the other states that have weighed in on the issue, got it right.

D.

I further differ with the majority because I believe that <u>N.J.S.A.</u> 43:6A-13(b) arrogates exclusive gubernatorial authority, impairs the essential integrity of the Chief Executive, and revokes senatorial prerogative, all of which violate separation of powers doctrine. In particular, <u>N.J.S.A.</u> 43:6A-13(b) does violence to the Constitution's complementary goals of (1) ensuring a strong Chief Executive and (2) investing the Governor with the solitary, plenary power — subject only to the advice and consent of the Senate — of making judicial appointments:

> The Governor shall nominate and appoint, with the advice and consent of the Senate, the Chief Justice and associate justices of the Supreme Court, the Judges of the Superior Court, and the judges of the inferior courts with jurisdiction extending to more than one municipality . . . . No nomination to such an office shall be sent to the Senate for confirmation until after 7 days' public notice by the Governor.
>
> [<u>N.J. Const.</u> art. VI, § 6, ¶ 1.]

---

[13] Ironically, the Massachusetts recall statute parsed by <u>Opinion of Justices</u>, with its features of gubernatorial and Executive Council involvement, might actually survive separation-of-powers scrutiny, unlike <u>N.J.S.A.</u> 43:6A-13(b).

The Legislature's delegation to the Supreme Court of the

authority to select recall judges directly contravenes this

provision.[14]  It is no answer to suggest that in order to qualify

as a recall judge, one had to have already run the nomination-

appointment-and-confirmation gauntlet twice.  That may be true,

but upon retirement, a judge not only steps aside from and gives

up his or her judicial power, but also expressly resigns his or

her judicial office.  See N.J.S.A. 43:6A-7 (requiring that, as

part of the application for benefits under the Judicial

Retirement System, the judge submit "a copy of the [judge's]

resignation from his [or her] judicial office which he [or she]

has filed in the office of the Secretary of State").[15]

I ask the following question: Would it be possible for the

Legislature to bestow the power to recall retired judges upon,

---

[14] Legislative involvement in the appointive process under the 1844 Constitution was seen as a chief evil sought to be eradicated in the 1947 Constitution.  See, e.g., 4 Proceedings of the Constitutional Convention of 1947, supra, at 671-75.

[15] Analogously, when a lawyer resigns without prejudice from the New Jersey bar, "the membership in the bar of this state shall cease," R. 1:20-22(c), and "any subsequent application for membership shall be in accordance with the provisions of New Jersey Court Rules 1:24 and 1:25, including passing the bar examination."  See http://www.judiciary.state.nj.us/oae/faqs/ reswoprej.pdf (last visited April 7, 2014). Resignation has consequences.

say, the President of the Senate, or a committee comprised of the deans of New Jersey's law schools, or the Chief Justice individually? I think not.[16] Although there is logic and practicality to making the Supreme Court the arbiter of those in the ranks of retired judges who are recalled to active duty, there is not a constitutional whiff, much less one word, of such authority residing within the judiciary itself.

"The doctrine of separation of powers is fundamental to our State government." Mt. Hope Dev. Assocs. v. Mt. Hope Waterpower Project, L.P., 154 N.J. 141, 150 (1998). The Constitution provides that "[t]he legislative power shall be vested in a

---

[16] If the Legislature had chosen the Chief Justice alone as the instrument of recalling retired judges, there would, at least, be a plausible argument to support that choice. See N.J. Const. art. VI, § 7, ¶ 2 ("The Chief Justice of the Supreme Court shall assign Judges of the Superior Court . . ., and may from time to time transfer Judges from one assignment to another, as need appears."); cf. In re P.L. 2001, Chapter 362, 186 N.J. 368, 381-82 (2006) (Constitution gives Court exclusive authority over State judiciary); In re Judges of Passaic Cnty., 100 N.J. 352, 367 (1985) (per curiam) (recognizing Court's constitutional responsibility for effective functioning of judiciary). However, the power to assign judges is quite unlike the power to select judges. The Chief Justice plays no role in the Governor's nomination-and-appointment and Senate's advice-and-consent processes. As the judiciary's leader, the Chief Justice is limited to the assignment of personnel that are provided by the political branches of government, much like a hockey coach who makes do with players selected by the team's general manager and owner. Unlike the dynamics of a professional sports team, the Chief Justice, as administrative head of the judiciary, N.J. Const. art. VI, § 7, ¶ 1, cannot burnish the quality of the team by requesting a judge's trade, or demotion to the minor leagues.

Senate and General Assembly," N.J. Const. art. IV, § 1, ¶ 1, and "[t]he executive power shall be vested in a Governor." Id. at art. V, § 1, ¶ 1. By these provisions, our Constitution prohibits any one branch of government from exercising powers assigned to a coordinate branch. The separation of powers doctrine was designed to "maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of unchecked power in the hands of any one branch." David v. Vesta Co., 45 N.J. 301, 326 (1965) (footnote and emphasis omitted).

"Despite the explicit constitutional mandate that 'contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch,'" the judiciary has "always recognized that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government." Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 449-50 (1992) (quoting Knight v. Margate, 86 N.J. 374, 388 (1981)). Moreover, it has been "long recognized that '[t]he compartmentalization of governmental powers . . . has never been watertight.'" State v. Loftin, 157 N.J. 253, 284 (1999) (quoting In re Salaries for Prob. Officers of Bergen Cnty., 58 N.J. 422, 425 (1971)). Additionally, a flexible approach to

separation of powers issues is employed in cases that have been brought to the Court. Ibid.

Notwithstanding this practical and collaborative approach to government, "[t]he Governor (Executive) is authorized to nominate and appoint. The Senate (Legislative) is to advise and, before the appointment may be finally made, to consent." Passaic Cnty. Bar Ass'n v. Hughes, 108 N.J. Super. 161, 173 (Ch. Div. 1969). "Missing from the Constitution is any role for the judiciary." De Vesa v. Dorsey, 134 N.J. 420, 430 (1993). Thus, the legislative delegation of a mechanism to reinstate judicial power in a retired judge is unconstitutional.[17]

A related separation of powers concern is the unintended inertial effect that N.J.S.A. 43:6A-13(b) has upon the replacement of retiring judges. When judges retire (at age seventy or earlier), vacancies are created that need to be promptly filled by executive and senatorial action. See

_____

[17] As an aside, N.J.S.A. 43:6A-13(b)'s provision permitting a retired Supreme Court Justice to be "recalled by the Supreme Court for temporary service in the Supreme Court" is undoubtedly unconstitutional because N.J. Const. art. VI, § 2, ¶ 1 expressly limits temporary assignments to the Supreme Court as follows: "When necessary, the Chief Justice shall assign the Judge or Judges of the Superior Court, senior in service, as provided by rules of the Supreme Court, to serve temporarily in the Supreme Court." I decline any further comment in light of the concurring, abstaining, and dubitante opinions in Henry, supra, 204 N.J. at 340, 354, 525 (2010) (Rabner, C.J., concurring; Rivera-Soto, J., abstaining; Hoens, J., dubitante).

N.J.S.A. 2B:2-1.2 (requiring "the Administrative Office of the Courts [to] notify the Legislature as vacancies occur").  It is probable that the intangible political dynamics that affect why such prompt action does not often take place are not directly influenced by the recall statute.  Nevertheless, the Supreme Court's ability to insert its collective thumb — through the enlistment of retired judicial elders — in the levee of a never-ending caseload removes an incentive to appoint replacement judges.  Although the effect of N.J.S.A. 43:6A-13(b) is hard to measure, with at least seventy-three retired judges — more than sixteen percent of the total complement of authorized Superior Court judges — toiling in the vicinages and on special assignments, there is an obvious disincentive to seed the judiciary with a fresh crop of judges.  The recall statute creates an artificial supply of judges that satisfies an incessant and inevitable demand as active judges age or otherwise opt out of their judicial offices.

This is not a classic separation of powers phenomenon, but it is one that implicates a significant concern of the framers. Not only does the use of over-age-seventy jurists arithmetically drive up the average age of the institution, making it less representative of the people it serves, but also it constrains the institution's ability to profit from the energy and fresh

A-0630-12T1

outlook of younger jurists.  Cf. 4 Proceedings of the
Constitutional Convention of 1947, supra, at 170 (memorializing
the discussion between Judge Daniel J. Brennan and delegate Amos
F. Dixon regarding the retirement of judges at a reasonable age
to avoid "blocking the progress of a lot of very able men who
could step into those positions if they stepped out").  If we
were faithful to the Constitution, and no temporary assignments
were possible, it is likely that public outcry would summon the
political machinery necessary to swiftly invoke the nomination,
appointment, advice, and consent processes to fill vacancies,
and thereby fulfill the expectations of the framers for the
benefit of the people.

E.

A fundamental disagreement between my views and the
majority's lies in the separateness of judicial power and the
persons who may be authorized to exercise it.  The challenged
legislation —— indeed, all judicial recall legislation that does
not follow a constitutionally-authorized appointment process ——
operates on the unspoken assumption that "once a judge, always a
judge."  This view necessarily must acknowledge that retired
judges —— after resigning and qualifying for a judicial pension
(which qualification is, among other things, a prerequisite for
recall) —— retain latent embers of judicial authority that can

27

be reanimated by Supreme Court recall orders.  See N.J.S.A. 43:6A-13(c) ("Upon such recall the retired . . . judge shall have all the powers of a . . . judge of the court to which he is assigned   . . . .").  The Constitution leaves no room for such restorative powers once a judge turns seventy years old,[18] and I am loath to declare the discovery of such hidden potential in the face of the obstacles I have outlined.

Furthermore, retired judges have no essential need for this intangible spark because they are clearly not, as the majority attributes to me, trapped in some "irrevocable alienation of pensioner from title, a kind of sequestration, worse yet quarantine, rendering the judicial retiree incognito, isolated and idle, relegated to some sort of professional limbo, yet imprisoned by all the ethical restraints of a status and an office that somehow no longer exist."  Ante at ___ (slip op. at 28).  Life after a judicial career may be either professionally robust or crabbed, but it is not dependent upon being available for temporary recall.  And the ethical contours that guide judges' conduct in retirement, see, e.g., N.J.S.A. 43:6A-13(a);

---

[18] Although it is not part of the present appeal, I also believe that an early-retired judge under the age of seventy years, see N.J.S.A. 43:6A-8(a) and -8(b), cannot be recalled for temporary service under the Constitution because upon that judge's resignation, he or she ceases to possess any judicial authority, and neither the Legislature nor the Supreme Court has any power to restore it.

28                                          A-0630-12T1

Administrative Directive #5-08 (March 24, 2008), are proper constraints that ensure the judiciary's hallmark of independence, integrity, fairness, and quality service.  After a public service career, a retired judge owes the institution at least that much.

F.

Notwithstanding its salutary purposes and practical success, N.J.S.A. 43:6A-13(b) cannot be justified when taking bearings from the Constitution.  Historical acceptance cannot establish the statute's bona fides, see Henry, supra, 204 N.J. at 345 (Rabner, C.J., concurring) (noting that "historical practice alone rarely proves the correctness of a legal proposition"), and historical patterns cannot save an unconstitutional practice.

I take final comfort in the recollection of Morris M. Schnitzer, who was asked in 1995, "Was it contemplated that judges, once retired at age 70, could be recalled?" Conversations with Morris M. Schnitzer, supra, 47 Rutgers L. Rev. at 1401.  Schnitzer —— who was present during the Constitution's conception, gestation, and birth —— unequivocally responded: "Certainly not, since that would have resurrected the example of Justice Parker and others who sat long after their

peak." <u>Ibid.</u> If that is the way Schnitzer remembered it, who am I to disagree?

Accordingly, I dissent.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION